```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
```

Rochelle L. Wallace,          :

      Plaintiff,          :

   v.                           :Case No.  2:16-cv-316

                                 :CHIEF JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social         Magistrate Judge Kemp
Security,                     :

      Defendant.          :

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Rochelle L. Wallace, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on December 20, 2012, and alleged that Plaintiff became disabled on February 1, 2012.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on January 26, 2015.  In a decision dated March 11, 2015, the ALJ denied benefits.  That became the Commissioner's final decision on February 22, 2016, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 20, 2016.  Plaintiff filed a statement of errors on August 8, 2016, to which the Commissioner responded on November 17, 2016.  Plaintiff filed a reply brief on December 5, 2016, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 44 years old as of the date of the

hearing and who has a twelfth grade education and also went to cosmetology school, testified as follows. Her testimony appears at pages 42-65 of the administrative record.

After describing her current living situation - Plaintiff lived with her father and her two teenaged children - Plaintiff was asked about her work history. She said she had last worked in 2012 as a self-employed hair stylist. Before that, she worked for a company that made circuit boards, but quit that job to go to school full-time. She had also been an engraver and had unloaded freight at a J.C. Penney store. Lastly, she had worked for a spark plug manufacturer as an inspector and as a cashier at a Family Dollar store.

When asked why she could no longer work, Plaintiff said that she had pain on a daily basis which affected her knees, hips, and hands. She was also short of breath and had become depressed due to being unable to work or care for her family. She took Prednisone every day and also got a Remicade infusion every five weeks, a procedure which took close to three hours and which left her exhausted for several days afterward. She recently had surgery on her hand and elbow.

On a typical day, Plaintiff got up at 9:00 or 10:00, put drops in her eyes, and got dressed. Sometimes she visited her mother, but mostly she watched television or went to medical appointments. She said, in response to questions from her counsel, that she was diagnosed with sarcoidosis in 2012 and that she took multiple medications for that condition. Also, as she got closer to the days on which she received her infusion, her joints would become very sore and her activities were limited. Plaintiff also suffered fatigue from the Methotrexate which she took every Monday. Her eyes were sensitive to light and she used drops to combat dryness. Finally, she described bad headaches which occurred on a monthly basis and which lasted two or three

days.

### III.  The Medical Records

The pertinent medical records are found beginning at page 293 of the administrative record.  They can be summarized as follows.

#### A.  Physical Impairments

Chronologically, the first record of significance concerning Plaintiff's physical impairments is a questionnaire completed by Dr. Kaswinkel.  He said that he had treated Plaintiff from May 11, 2012 to June 8, 2012 and that she had been diagnosed with sarcoidosis, Sjogrens syndrome (an immune system disorder), and ischemic retinopathy.  Her symptoms included headaches, swollen eyes, light sensitivity, floaters, painful eyes, and crusting.  She had been on Prednisone.  She had also not returned for a December, 2012 appointment.  He said he could re-evaluate her if she returned, and that she was functionally limited due to her sensitivity to light.  (Tr. 344-45).

Continuing with the history of Plaintiff's physical health, the next group of records which she discusses in her statement of errors are treatment notes from Dr. Lake, who was a consulting rheumatologist.  Dr. Lake saw Plaintiff on December 12, 2012 for various conditions including sarcoidosis.  At that time, Plaintiff was being given Remicade infusions.  She was tolerating the procedure but not noting any significant improvement.  She reported some slight blurring of her vision as well.  Also, she had acute right ankle pain and swelling.  (Tr. 584-85).  Prior treatment notes show the same diagnoses and treatment with prednisone before the Remicade infusions were approved, and symptoms such as headaches, shortness of breath, chest pain, and discomfort in the back, hips, knees and ankles.  (Tr. 586-91).  Dr. Lake continued to see Plaintiff in 2013, reporting on March 21 of that year that Plaintiff still had significant pain despite

taking both Remicade and methotrexate.  Her areas of discomfort included her hands, wrists, ankles, knees, and hips.  She demonstrated discomfort to slight touch throughout the hands and arms as well as in the lower extremities.  Dr. Lake suggested that there might be a myofascial component to the pain, and started her on Cymbalta.  The next report, dated May 29, 2013, stated that Plaintiff was getting day-long headaches several times per week and was still having significant pain in her hands and wrists, with somewhat lesser pain in her knees and hips.  She also experienced some swelling in her legs as well as fatigue.  Her Remicade infusions had been increased in frequency but Dr. Lake said that if she did not improve, the frequency could be increased again.  (Tr. 727-30).

When Dr. Lake saw Plaintiff again in August, 2013 she was much the same, although she reported increasing shortness of breath. (Tr. 881-82).  Dr. Lake saw Plaintiff again on March 26, 2014, at which point Plaintiff was put back on methotrexate (which had been discontinued) due to continued pain in her joints.  She demonstrated diffuse pain but particularly in the hips, knees, and ankles.  The frequency of her Remicade infusions was increased.  Plaintiff returned to Dr. Lake in July, 2014, at which time she reported improvement in her joint pain, but still had significant problems in her hands.  She had taken a trip to Florida and the Dominican Republic.  Dr. Lake increased the amount of Neurontin she was prescribing.  (Tr. 976-981).

Dr. Lake was subsequently asked to respond in writing to a question about whether Plaintiff's illness would cause her to miss two or more days of work per month.  Dr. Lake said that such absences were likely due to flare-ups of Plaintiff's underlying disease (described in the question as "sarcoidosis and or rheumatoid arthritis") which could cause joint pain, vision changes, skin rash, shortness of breath, and chest pain, among

other side effects. (Tr. 1011).

Plaintiff also received treatment for her sarcoidosis from Dr. Baughman. He first saw her on June 8, 2012, noting that Plaintiff had been reporting breathing problems for many years. She was treated for asthma but got markedly worse in February of 2012. That exacerbation was treated with prednisone, and she told Dr. Baughman that her main problem was now headaches. He reviewed various diagnostic studies which showed some lung abnormalities and concluded that Plaintiff had sarcoidosis. He suggested Remicade infusions as one possible treatment option. On October 12, 2012, Dr. Baughman reported to Dr. Lake that Plaintiff was about the same as the last time he saw her. His next report, dated April 9, 2013, indicates that Plaintiff was still having a problem with aching joints "pretty much all the time." Dr. Baughman believed that this symptom was related to the sarcoidosis and he suggested increasing the frequency of her Remicade infusions. (Tr. 669-680). He saw Plaintiff again in July, 2014, noting that Plaintiff was doing fairly well with her medications but still had problems with her joints, including being able to retract her hands. (Tr. 1023-24).

### B. Mental Impairments

Turning now to Plaintiff's mental health history, Plaintiff underwent a diagnostic assessment in 2012 at North Central Mental Health Services. In a report dated July 2, 2012, the counselor noted that Plaintiff was having trouble sleeping and had decreased appetite, experienced crying spells, and was depressed three or four days per week. She had lost interest in activities and had poor short-term memory. Her mood and affect were described as "clearly depressed" and Plaintiff said she had difficulty getting out of bed. She was diagnosed with a depressive disorder and her GAF was rated at 50. It was recommended that she continue to follow up with her regular

doctor and take all of her medications as prescribed. (Tr. 350-58).

There are also counseling notes from North Central. They appear to begin in October, 2013 and indicate diagnoses of anxiety and depression. The notes show generally that Plaintiff was upset about her physical impairments and that she also had some family stressors. Her chronic pain negatively impacted her mood. She was taking thirteen different medications and going to medical appointments several times per week. She was receiving medication from a psychiatric nurse practitioner. At one point, she reported improvement of her symptoms with Risperdal, and her mood had stabilized to the point where she was enjoying activities. In 2014, she began a relationship which turned out to be stressful, but in June of that year she said that her sleep and appetite were satisfactory although her energy level was slightly low. She also canceled a number of appointments between October, 2013 and August, 2014. (Tr. 900-44). At an appointment in September, 2014, she said she was feeling depressed but admitted to not taking all of her medications as prescribed. Plaintiff still reported significant physical pain and said that her appetite and energy level had decreased. She was about the same the following month, but her mood was better at the next appointment. (Tr. 998-1010).

Plaintiff's social worker at North Central, Joe Rogers, and her psychiatrist, Dr. Haq, jointly signed a mental capacity statement in December, 2014. They indicated that Plaintiff had marked impairments in several areas relating to complex or detailed instructions and also with respect to interaction with others and responding to work pressure. They commented that she did not deal well with stress. (Tr. 1020-22).

On April 8, 2013, Dr. Hammerly performed a psychological evaluation. He conducted a 45-minute clinical interview and did

not administer any psychological testing (although some intelligence testing may have been done).  Plaintiff said her disability claim was based on sarcoidosis with its accompanying pain in her joints and physical limitations.  She had been on medication for depression since the past summer.  She described problems sleeping and with increased appetite.  Her daily activities including helping her mother, who just had surgery, and going to medical appointments.  Her gait and posture appeared to be affected by chronic pain.  She seemed downcast and expressed feelings of hopelessness, guilt, worthlessness, and helplessness.  Her mental functioning was grossly intact.  Dr. Hammerly diagnosed major depression and rated Plaintiff's GAF at 55.  He concluded that she could understand work instructions at an average level, had no problems with concentration, persistence, or pace, would have some difficulty relating to others, and would be expected to "respond with decreased effectiveness when subjected to ordinary workplace pressures." (Tr. 612-20).

## C.  State Agency Reviewers

The file also contains opinions from state agency reviewers.  As to Plaintiff's physical impairments and functional capacity, Dr. Klyop concluded, on March 5, 2013, that Plaintiff could do a range of light work with some postural and environmental limitations, but no manipulative or visual limitations, although he added at the end of the form, the statement that she was "in need of light sensitive restrictions due to ischemic retinopathy."  (Tr. 88-90).  Dr. Cruz, on July 22, 2013, reached the same conclusions.  (Tr. 121-23).  Both said that they gave great weight to Dr. Kaswinkel's opinion about light sensitivity.  Neither had the chance to review Dr. Lake's opinion or any of her letters which were written after July, 2013.

Dr. Goldsmith was the first psychological reviewer.  On

April 17, 2013, he stated that Plaintiff had sustained concentration and persistence limitations as well as moderate limitations on the ability to complete a workday and week without interruptions from psychologically-based symptoms, but she could perform simple and routine work activity which was not fast-paced or had unusual production demands.  She also was moderately impaired in her ability to relate to the general public and to supervisors (Tr. 89-91).  The second reviewer, Dr. Seleshi, concurred on a form which he signed on July 26, 2013.  Both of those reviews predated the bulk, if not the totality, of the notes from North Central and did not consider the opinion statement from Dr. Haq.

## IV.   The Vocational Testimony

Eric Pruitt testified as the vocational expert.  His testimony begins on page 66 of the administrative record.

First, Mr. Pruitt was asked to characterize Plaintiff's past employment.  He said that she did, for the most part, light work, although one of the jobs was medium, and that the jobs ranged from unskilled to skilled.

Mr. Pruitt was then asked some questions about a hypothetical person of Plaintiff's age, education, and background who could do light work but could only occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, and could frequently stoop, kneel, crouch, and crawl.  He or she also had to avoid hazards like unprotected heights, dangerous machinery, and commercial driving.  Also the person could understand, carry out, and remember simple instructions and make judgments on simple work, could respond appropriately to usual work situations and changes in a routine work setting, and was precluded from high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, or directing the work of or being

responsible for the work of others.  Lastly, the person could have only occasional interaction with supervisors, coworkers, and the general public.  Mr. Pruitt testified that someone with those restrictions could do three of Plaintiff's past jobs - parts inspector, machine engraver, and pre-assembly printed circuit board inspector.  Also, such a person could work as a production line solderer, mail sorter, and label coder.

Next, Mr. Pruitt was asked about a person who, in addition to the above limitations, could only handle, finger, and feel with the dominant hand on a frequent basis.  That restriction ruled out the circuit board inspector position, but not the others.  If the person could do those activities on only an occasional basis, however, all of the jobs would be eliminated, but the person could be employed as a blending tank tender and in other positions which totaled about 100,000 in the national economy.  If, however, the person missed one or two days of work each month, that would result in termination from all of the jobs he identified.

Mr. Pruitt was also asked some questions by Plaintiff's counsel.  In response to those questions, he testified that someone who is markedly limited in dealing with complex job instructions, interacting with others, and responding to changes in the work setting was not employable.

### V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13-27 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017.  Second, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments

-9-

including sarcoidosis, carpal tunnel syndrome and mild osteoarthritis of the left hand, obesity, and major depression. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could do light work but could only occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, and could frequently stoop, kneel, crouch, and crawl.  She could frequently handle, finger, and feel with the left upper extremity.  She also had to avoid hazards like unprotected heights, dangerous machinery, and commercial driving, and could understand, carry out, and remember simple instructions and make judgments on simple work.  He also found that Plaintiff could respond appropriately to usual work situations and changes in a routine work setting but was precluded from high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, or directing the work of or being responsible for the work of others.  Finally, she could have only occasional interaction with supervisors, coworkers, and the general public.

With these restrictions, the ALJ concluded that Plaintiff, could perform two of her past jobs, machine engraver and parts inspector.  Further, she could do the light jobs identified by the vocational expert, including production line solderer, mail sorter, and label coder.  He also found that those jobs existed in significant numbers in the local, state, and national economies.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI.  <u>Plaintiff's Statement of Errors</u>

In her statement of errors, Plaintiff raises a single issue. She argues that the ALJ did not properly consider and weigh the

medical source opinions and, as a result, his finding about Plaintiff's residual functional capacity was not supported by substantial evidence. This issue is considered under the following legal standard.

General Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Treating Source Opinions. A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D.

-11-

Ohio 1981). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. Bull v. Comm'r of Social Security, 629 F.Supp. 2d 768, 780-81 (S.D. Ohio 2008), citing Cornett v. Califano, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979).

A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. The weight given such a statement depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. §404.1527; Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985). In evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).

If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. Harris, 756 F.2d at 435. The Commissioner may have expertise in some matters, but cannot supplant the medical expert. Hall v. Celebrezze, 314 F.2d 686, 690 (6th Cir. 1963). The "treating physician" rule does not apply to a one-time examining medical provider, and the same weight need not be given to such an opinion even if it favors the claimant. Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994).

If the Commissioner does not give controlling weight to the opinion of a treating physician, the Commissioner is required to explain what weight has been assigned to that opinion, and why.

-12-

Failure to articulate the reason for discounting such an opinion with a level of specificity that allows the claimant to understand why his physician's views have not been accepted, and to allow the Court to review the ALJ's bases for making that decision, is almost always reversible error. Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

### Analysis of Plaintiff's Statement of Error

The starting point in any case where the ALJ allegedly has not given appropriate weight to the treating source opinions is the ALJ's decision itself. Since there are a number of treating sources at issue here, the Court will examine the decision's rationale as to each.

The Court begins with Dr. Kaswinkel, who, as noted above, concluded that Plaintiff had a functional limitation in the area of sensitivity to light, and whose opinion was given great weight by the two state agency reviewers who expressed opinions about Plaintiff's physical limitations. That restriction does not appear in the ALJ's residual functional capacity finding. Dr. Kaswinkel is not mentioned in the ALJ's summary of the evidence and his opinion was not acknowledged. The ALJ said that he gave some weight to the opinions of the state agency physicians as being "derived from and consistent with the medical evidence of record," Tr. 23, but he concluded that the evidence given at the hearing supported "additional limitations" which he added to the ones they proposed. Id. Nothing in the ALJ's decision suggests that he considered Dr. Kaswinkel to be a treating source or that he was even aware that the state agency reviewer's had given great weight to it.

The Commissioner suggests that this omission was harmless error because Dr. Kaswinkel was really not a treating source - he did treat Plaintiff but only saw her twice - and because no reasonable person could have accepted his "patently deficient

opinion." See Doc. 14, at 11. This appears to be a reference to the Court of Appeals' observation in Wilson that the failure to articulate the basis for evaluating a treating source opinion as required by §404.1527(c) can be harmless error "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it...." See id. at 547. That is a difficult argument to make when two state agency physicians whom the ALJ described as "experts" and "medical doctors with knowledge of the Social Security Administration's program and requirements," Tr. 23, apparently thought otherwise. Dr. Kaswinkel was a specialist in eye diseases and based his opinion on two examinations. There is nothing patently deficient about that. Even if he did not see Plaintiff often enough to qualify for full consideration as a treating source, the ALJ's complete failure to acknowledge that opinion, to discuss it, or to recognize that the state agency physicians gave it weight, is enough to justify a remand. Cf. Gayheart v. Comm'r of Social Security, 710 F.3d 365, 378 (6th Cir. 2013)(pointing out that the considerations set forth in §404.1527(c) apply to all medical sources, and that some discussion should be included in an ALJ's decision even of opinions from persons who are not "acceptable medical sources").

 Dr. Lake, unlike Dr. Kaswinkel, was the subject of some considerable discussion in the ALJ's decision. She was correctly regarded as a treating source. However, the ALJ rejected her opinion about how often Plaintiff would suffer from increased symptoms, and therefore miss work, for these reasons. First, the ALJ said that "the [probably should be "she] references the claimant to have rheumatoid arthritis, which ... is not a medically determinable impairment in this claim." (Tr. 22). Next, the ALJ said that the "record as a whole" does not support this limitation because, as the ALJ interpreted the record, Plaintiff sarcoidosis was "well controlled with current

treatments." Id. Finally, the ALJ appeared to suggest that the basis of Dr. Lake's opinion was Plaintiff's own report of symptoms since Dr. Lake's own notes were "rather benign in the discussion of physical findings." (Tr. 23).

One of the problems with this analysis is the ALJ's attempt to characterize Dr. Lake as both having diagnosed Plaintiff with rheumatoid arthritis and as having attributed her flare-ups to that condition. No reasonable person could conclude, based on a fair reading of the record, that Dr. Lake's reference, in her note of December 29, 2014, to Plaintiff's "underlying disease" was a reference to rheumatoid arthritis. Dr. Lake had treated Plaintiff for years for sarcoidosis. Sarcoidosis was mentioned in the typewritten question on the form. The ALJ has a duty to construe the record fairly rather than to engage in a stretched or selective reading in order to be able to give less weight to a treating source opinion. See, e.g., Germany-Johnson v. Comm'r of Social Security, 313 Fed.Appx. 771, 777 (6th Cir. Nov. 5, 2008)(criticizing the ALJ for being "selective in parsing the various medical reports"); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994)("[w]e have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence"). Consequently, the first basis on which the ALJ discounted Dr. Lake's opinion is not a "good reason" to do so.

Secondly, it appears that the ALJ engaged in his own interpretation of the medical evidence in order to discount Dr. Lake's opinion. Sarcoidosis is not the same type of disease as, for example, degenerative disk disease, which produces specific findings that are typically present during a physical examination. It was not for the ALJ to determine that what he called "relatively benign physical findings" on examination meant that Plaintiff did not suffer from periodic exacerbations of her disease, leading to the kind of pain and inflammation that would prevent her from doing a full day's work. In making that

determination, he essentially ignored the lengthy treatment history, spanning several years and multiple visits, present in the record, which placed Dr. Lake in a unique position to evaluate the severity of Plaintiff's symptoms.  The ALJ also failed to discuss the course of treatment, which, read reasonably, showed that Plaintiff's symptoms worsened over time, leading to the initiation of new therapies like Remicade infusions, and an increase in medications because her symptoms were not responding.  These are all relevant factors under §404.1527(c), and the ALJ's failure to consider them, especially given the extent of this treatment history, prevents the Court from finding that he discharged his responsibility under that regulation and decisions like Wilson, supra and Rogers, supra.  This is especially true where, as here, the ALJ appeared to base much of his residual functional capacity finding (except for some additional postural restrictions) on the opinions of the state agency reviewers, neither of whom had the opportunity to review either the extensive treatment notes from Dr. Lake or Dr. Baughman, and who did not have a chance to consider her opinion.

    The final set of treating source opinions relate to Plaintiff's psychological impairments.  The Court does not believe that an extensive discussion of the ALJ's evaluation of the opinion of Dr. Haq and the social worker is necessary in light of the need to remand the case for other reasons.  It is important to note, however, that the main issue flagged by the opinion signed by both of those treating sources is Plaintiff's ability to handle work stress.  The ALJ gave great weight to Dr. Hammerly's opinion, and he noted the same problem.  On remand, the ALJ should insure that he gives adequate weight to Dr. Haq's opinion, including determining the frequency with which Plaintiff was treated by him; that he considers the social worker's opinion using proper evaluation tools even though the social worker is not an "acceptable medical source," see Gayheart, supra; and that

he considers whether the state agency opinions on this issue are still valid in light of the subsequent mental health treatment received by Plaintiff, and which they had no opportunity to evaluate.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp  
United States Magistrate Judge